

# SEALED

JD:JPM/PP
F#: 2018R00002

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK



- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

KEVIN LAU,
KENNETH TAM, and
JACK THAI,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

TO BE FILED UNDER SEAL

AFFIDAVIT AND
COMPLAINT IN SUPPORT OF
APPLICATION FOR ARREST
WARRANTS

(21 U.S.C. § 846)

19-MJ-626

EASTERN DISTRICT OF NEW YORK, SS:

        JOSEPH FALGIANO, being duly sworn, deposes and states that he is a Task Force Officer with the United States Department of Homeland Security, Homeland Security Investigations, duly appointed according to law and acting as such.

        In or about and between February 2015 and December 2018, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants KEVIN LAU, KENNETH TAM, and JACK THAI, together with others, did knowingly and intentionally conspire to distribute and possess with intent to distribute a controlled substance, which offense involved a substance containing marijuana, a Schedule I controlled substance, contrary to Title 21, United States Code, Section 841(a)(1). The amount of marijuana involved in the conspiracy attributable to each defendant as a result of his own conduct, and the conduct of other conspirators reasonably foreseeable to him, was 1,000 kilograms or more of a substance containing marijuana.

        (Title 21, United States Code, Sections 846)



The source of your deponent's information and the grounds for his belief are as follows:[1]

1. I am a Task Force Officer with the United States Department of Homeland Security, Homeland Security Investigations ("HSI"), and have been involved in the investigation of numerous cases involving drug trafficking. I am also a Sergeant with the Queens County District Attorney's Office and member of the NYC-JFK Border Enforcement Security Task Force (the "Task Force"), a joint law enforcement task force between HSI and other law enforcement agencies based at John F. Kennedy International Airport ("JFK Airport") in Queens, New York. I am familiar with the facts and circumstances set forth below from my personal participation in the investigation, my review of the investigative file, and from reports of other law enforcement officers involved in the investigation.

2. Since at least February 2015, the defendant KEVIN LAU has been arranging large-scale marijuana shipments carried by tractor trailer from California and Washington State for delivery to various locations across the United States including Queens, New York. The defendants KENNETH TAM and JACK THAI, among others, worked with LAU to transport and distribute marijuana and carry and hide the cash proceeds of drug trafficking.

3. In order to transport the marijuana from the West Coast, LAU arranged for the marijuana to be placed within shipping crates and falsely labeled as containing

---

[1] Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all of the relevant facts and circumstances of which I am aware.



CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY:_____ DEPUTY

furniture, garments, or other items. The shipping crates were wrapped in black cellophane and then transported by shipping and transportation companies in tractor trailers. LAU used fictitious company names, including "Furniture Brothers," "Coastal Designs," and "New Century Design" as the shipping and receiving customers for the deliveries of marijuana. The shipping crates were not delivered to legitimate businesses but instead delivered to LAU's co-conspirators and stored in commercial storage facilities and residences in New York City. According to truck rental records, LAU was listed as the point of contact for "Furniture Brothers" and TAM was listed as a "driver."

    4. According to records provided by shipping and freight-forwarding companies that arranged for or transported crates sent by "Furniture Brothers," at least 150 cross-country shipments sent between February 2015 and July 2018 were signed for by "Michael Lin" or a derivation of that name (e.g., "Mike," "Lin" or "Lynn"). Law enforcement agents have determined the "Michael Lin" name to be a fictitious name used by TAM and other co-conspirators who actually received the crates. Usually, these shipments listed a telephone number with a New York area code that ended in "1128" (the "1128 Number") as the contact for "Coastal Designs" and "New Century Design." On at least one occasion, in or about July 2017, TAM's name was used (instead of the "Michael Lin" name) to sign for a "Coastal Designs" delivery of two pallets weighing approximately 1,300 pounds. Additionally, TAM's driver's license was provided to the transportation company that made the delivery. In total, agents have identified more than 200 tractor-trailer shipments with similar sender, receiver, and contact information that appear to be part of the drug-trafficking scheme described herein. The total weight of those shipments, according to shipping records, was approximately 185,000 pounds. Based on the seizure of several

4

shipments to "New Century Design" in July 2018, as further described below, Task Force officers estimate that the 200 shipments contained at least 100,000 pounds of marijuana, marijuana oil, and drug paraphernalia.

     5.     In or about September 2017, Confidential Informant 1 ("CI-1"),[2] acting at the direction of law enforcement agents, informed LAU that CI-1 had an employee at JFK Airport who could assist LAU in bypassing U.S. currency past Transportation Security Administration ("TSA") baggage screeners at the airport. On or about September 13, 2017, CI-1 met with LAU at a location in Flushing, New York. During the meeting, which was audio recorded, CI-1 and LAU discussed, among other things, the price of various strains of marijuana and how LAU transported marijuana. LAU described that he used people to transport cash proceeds of marijuana sales aboard airline flights. LAU also stated that he had been "hit" several times, explaining that law enforcement officers had seized money from LAU's "worker" in Orlando, Florida, and Charlotte, North Carolina. LAU stated that the Orlando seizure was $130,000 and the Charlotte seizure was $24,000.

     6.     Based on my participation in this investigation and review of law enforcement reports, I know that LAU's reference to his "worker" being "hit" was to two seizures of cash from TAM, which had occurred in February 2017 and June 2017, respectively, and which are detailed as follows:

---

[2] CI-1 pleaded guilty in federal court to various drug-trafficking offenses. CI-1 met with law enforcement agents and provided information in the hope of gaining leniency at CI-1's sentencing. CI-1's information was corroborated by other information, including the information described below, and was shown to be reliable.

        a.     On or about February 1, 2017, TAM was at the Orlando Airport scheduled to travel to Newark, New Jersey. TSA officers identified a large amount of cash in TAM's carry-on luggage. HSI agents responded and interviewed TAM. TAM stated, among other things, that he was in the business of selling shoes in all cash transactions and that his business was done by word-of-mouth referrals. Agents identified that TAM was carrying only a sweatshirt and two pairs of shoes despite stating that he had traveled to multiple states over a number of days. Agents searched TAM's baggage and identified approximately $131,000 in currency sealed in Fed-Ex envelopes. After a drug-detecting canine alerted to a drug odor on the packages, HSI agents seized the currency.

        b.     On or about June 28, 2017, during TSA screening at Charlotte Douglas International Airport, TSA agents identified a large amount of cash in TAM's carry-on baggage. After HSI agents responded, TAM told agents that he was a gambler, sold cars, and had an interest in a nail salon. Law enforcement officers identified approximately $24,000 in currency inside two United States Postal Service Priority Mail envelopes. TAM told agents he had traveled from New York to Charlotte and was planning to travel to Las Vegas. After a drug-detecting canine alerted to a drug odor on the packages, HSI agents seized the currency.

        7.     On or about September 27, 2017, Task Force officers arranged for CI-1 to conduct a meeting with LAU and Confidential Informant 2 ("CI-2"), an employee of a U.S.-based airline.[3] During the meeting between LAU, CI-1, and CI-2, which was audio

---

[3] CI-2 is not a U.S. citizen. CI-2 has an agreement with HSI to provide information to law enforcement officers in exchange for receiving deferred action on CI-2's potential removal from the United States and an employment authorization that permits CI-2 to work

recorded, LAU told CI-2 that LAU was interested in using CI-2 to assist LAU in moving bags past TSA security at JFK Airport. CI-2 indicated that LAU should give him a bag that CI-2 could then bring past airport security and provide to LAU inside JFK Airport.

8. On or about October 4, 2017, LAU and CI-2 met in a parking lot near JFK Airport. CI-2 wore an electronic recording device. During the meeting, LAU provided CI-2 with a blue suitcase to take into JFK Airport for LAU. CI-2 instructed LAU to meet CI-2 in JFK Airport Terminal 4, where LAU would retrieve the suitcase. LAU also provided CI-2 with $2,000 cash for this arrangement, which CI-2 turned over to HSI agents following the meeting. CI-2 also provided HSI agents with the blue suitcase that LAU had given CI-2 to take into JFK Airport.

9. Task Force officers opened the blue suitcase and found that it contained FedEx envelopes. Upon opening one of the envelopes, law enforcement officers found that the envelope contained U.S. currency that was packaged and wrapped together. Agents estimated that each package contained approximately $50,000, for a total of approximately $300,000 in the blue suitcase. After law enforcement officers searched the blue suitcase, the FedEx packages were put back into the suitcase and it was closed and provided back to CI-2 to take into JFK Airport to deliver to LAU. Law enforcement officers then observed CI-2 enter JFK Airport and meet LAU in Terminal 4, where LAU was then observed carrying the blue suitcase. LAU then boarded a Virgin America flight from JFK Airport to San Francisco. After LAU arrived in San Francisco, HSI agents followed him to an address in San Francisco where LAU resides (the "Lau Residence").

---

in the United States. CI-2's information has proven reliable and has been corroborated by other information, including as described below.

10. In or about October 2017, CI-1, acting at the direction of law enforcement officers, arranged for the purchase of marijuana from LAU. LAU instructed CI-1 that an associate of LAU's would bring the marijuana to CI-1. On or about October 26, 2017, CI-1 and a law enforcement agent acting in an undercover capacity (the "UC") met with TAM at a location in Long Island, New York. Law enforcement agents observed TAM arrive at the meeting location in a black Ford Taurus with a New York license plate (the "Ford Taurus"). TAM left his vehicle and walked to a vehicle occupied by CI-1 and the UC. TAM placed a white bag inside the CI-1/UC vehicle. Upon opening the bag, law enforcement agents recovered one pound of marijuana packaged in a vacuum-sealed plastic bag labeled with the initials "SD" and a red circular sticker. Based on my experience in this investigation, I know that "SD" stands for "Sour Diesel," a strain of marijuana.

11. On or about December 7, 2017, CI-1 and the UC met with the defendant JACK THAI at the same location where TAM had delivered the marijuana to pay for the one pound of Sour Diesel. Prior to the meeting, LAU indicated to CI-1 that a person named "Jack" would meet CI-1 at the location. At the location, law enforcement agents observed the Ford Taurus arrive being driven by THAI. Using funds provided by law enforcement officers, CI-1 paid $1,900 to THAI.

12. On or about January 11, 2018, HSI agents at the San Francisco airport conducted surveillance of a United Airlines flight arriving from Washington, D.C. Agents had information that TAM was aboard the flight. Upon deplaning, agents observed that TAM remained in the gate area, appearing to wait for another individual. Eventually, a male later identified as Alexander Crispi, who has been charged separately, left the plane and approached TAM. TAM and Crispi began to walk out of the airport.

HSI agents then approached TAM and Crispi. In response to agents' questions, TAM stated, among other things, that he did not know Crispi but that he had met him on the flight from Washington, D.C. TAM stated that he did not have any checked luggage. After TAM consented to a search of his carry-on bags, agents found a baggage claim check and TAM admitted that he had, in fact, checked a suitcase on the flight. Crispi told the HSI agents that he had flown with TAM from Washington and that he had known TAM for many years.

13. HSI agents asked TAM and Crispi for consent to search their checked luggage, and both agreed to a search and accompanied the agents to the baggage claim area. At the baggage claim, TAM retrieved a small suitcase which he stated had approximately $10,000 in cash inside. Upon opening the bag, agents found a sealed FedEx envelope which TAM described as containing the cash. After being confronted with Crispi's statement about knowing TAM, TAM confirmed that he had known Crispi but denied knowing his full name. HSI agents received consent from Crispi to open his checked suitcase. Agents recovered approximately $62,770 from Crispi's baggage and $14,780 from TAM's baggage.

14. On or about March 15, 2018, HSI agents identified that THAI had traveled from New Orleans to San Francisco. Agents at the San Francisco airport met THAI after his flight arrived and interviewed him. THAI provided the address of the Lau Residence as his destination. THAI stated that he had been gambling at a casino in New Orleans and had played in a poker tournament. THAI allowed agents to search his carry-on bag. Agents found approximately $60,700 in currency concealed in two FedEx envelopes. After a drug-detecting canine alerted to a drug odor on the packages, HSI

agents seized the currency. Based on this, I believe THAI was carrying a large amount of cash to take to the Lau Residence.

15. On or about May 18, 2018, a large shipping crate, wrapped in black cellophane and shipped from a location in Washington State to Flushing, New York was damaged in transit (the "Damaged Package"). Employees of a freight forwarding company located in Jamaica, Queens reported to law enforcement agents that the Damaged Package contained quantities of marijuana. Law enforcement agents determined the Damaged Package contained more than 250 kilograms (551 pounds) of marijuana. The shipping customer listed on the package was "Furniture Brothers." The recipient was listed as "New Century Design" at an address in Flushing, New York. The contact name on the package was "Michael Lin." The Damaged Package listed the 1128 Number as a contact number.

16. On or about July 6, 2018, a parcel transport company informed Task Force officers that a shipping crate with the recipient contact listed as the 1128 Number was in transit from San Francisco to Astoria, New York. The recipient listed for the package was "New Century Design." The description of the crate's contents was "Furniture—6-8" and the weight was given as 605 pounds. The package was scheduled for delivery on July 11, 2018 (hereinafter, the "July 11 Package"). The address for delivery of the July 11 Package was a storage facility on 20th Avenue in Astoria, New York (the "Storage Facility").

17. On or about July 11, 2018, after the July 11 Package was delivered to the Storage Facility, law enforcement officers executed a search warrant at the Storage Facility on a locker rented under Crispi's name (the "Storage Locker"). Inside the Storage Locker, law enforcement officers recovered the July 11 Package and other pallets and boxes.

Agents recovered approximately 240 kilograms (529 pounds) of marijuana in the Storage Locker from three crates, including the July 11 Package.

18. On or about July 13, 2018, Task Force officers received information the Storage Facility that another shipment for "New Century Design" was being delivered to the Storage Facility. Task Force officers responded to the Storage Facility and identified a package similar in appearance and weight to the July 11 Package (hereinafter, the "July 13 Package"). The July 13 Package weighted approximately 412 pounds. After obtaining a search warrant for the July 13 Package, Task Force agents opened the crate and recovered approximately 129 kilograms (284 pounds) of marijuana.

19. On or about July 11, 2018, law enforcement officers arrested Crispi after he drove to the Storage Facility, appeared to observe law enforcement officers, and began driving away from the Storage Facility. At the time of his arrest, Crispi was driving the Ford Taurus. Crispi was also in possession of a phone that used the 1128 Number.

20. On or about September 19, 2018, CI-1 and LAU engaged in a telephone conversation that was audio recorded. On the call, LAU described the circumstances of Crispi's arrest, as described above. LAU stated, among other things, that "my dude" got "pulled over" and "bit" in Queens, New York. LAU stated that the "storage unit" got "busted." Asked if this individual was just working for him or for other people too, LAU stated that he did not want to say too much on the phone.

WHEREFORE, your deponent respectfully requests that arrest warrants be issued for the defendants KEVIN LAU, KENNETH TAM and JACK THAI so that they may be dealt with according to law.

11

WHEREFORE, your deponent respectfully requests that arrest warrants be issued for the defendants KEVIN LAU, KENNETH TAM and JACK THAI so that they may be dealt with according to law.

I further request that the Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the affidavit and arrest warrant. Based upon my training and experience, I have learned that criminals actively search for criminal affidavits and arrest warrants via the internet. Therefore, premature disclosure of the contents of this affidavit and related documents will seriously jeopardize the investigation, including by giving the defendant an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence and change patterns of behavior.

_____
JOSEPH PALGIANO
Task Force Officer, United States Department of Homeland Security, Homeland Security Investigations

Sworn to before me this
11th day of July, 2019

_____Robert Levy_____
THE HONORABLE ROBERT M. LEVY
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK